STATE OF CONNECTICUT *v.* DEION J. LONG
(SC 18245)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued February 18—officially released August 11, 2009

*Steven B. Rasile*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Brian Sibley*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Deion J. Long, appeals[1] from the judgment of conviction of one count of risk of injury to a child in violation of General Statutes (Rev.

---

[1] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

to 2005) § 53-21 (a) (2).[2] On appeal, the defendant claims that the remarks of the assistant state's attorney (prosecutor) to the jury in his closing and rebuttal arguments were improper and deprived him of his constitutional right to a fair trial.[3] We disagree with the defendant and, therefore, affirm the judgment of the trial court.

A jury reasonably could have found the following facts. On Friday, July 15, 2005, the fourteen year old victim, C,[4] and her sister arrived home from summer camp in the afternoon. Shortly thereafter, the defendant visited the apartment where C and C's mother and sister lived. The defendant's wife was friendly with C's mother, and C and her family knew the defendant through his wife. C and her family were all home when the defendant first arrived at the apartment. During this initial visit, the defendant entered C's bedroom, where she was lying on the bed under the covers, and attempted to make conversation with her. Finding C unresponsive, he left her room and returned to the kitchen. The defendant thereafter left the apartment with C's mother to drive her to a store, leaving C and her sister alone in the apartment.

The defendant later returned to the apartment alone and entered through the rear apartment door. At that time, C was resting on her bed, under the covers, wear-

---

[2] The jury found the defendant not guilty of sexual assault in the first degree; see General Statutes § 53a-70 (a) (1); and attempt to commit sexual assault in the first degree. See General Statutes §§ 53a-70 (a) (1) and 53a-49 (a).

[3] The defendant also initially claimed that the prosecutor used a peremptory challenge to disqualify a juror on the basis of racial considerations in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). At oral argument, however, the defendant's appellate counsel withdrew this claim.

[4] In accordance with our policy of protecting the privacy interests of victims in cases involving alleged sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

ing only her underwear.[5] After C's sister spoke briefly with the defendant in the kitchen and saw him enter C's bedroom, C's sister returned to her own upstairs bedroom. C, who had fallen asleep when the defendant and her mother left the house, awoke when she heard her bedroom door open. Upon entering C's bedroom, the defendant asked her why she was so tired. C did not answer but turned her head toward the defendant. The defendant then asked C if she had a boyfriend. She replied "no." The defendant then began rubbing C's back with one finger, moving it "[u]p and down in the middle of [her] back."

The defendant then removed the covers and pulled C toward him, exposing her bare chest. C tried to free herself but could not because the defendant was holding her left arm tightly. She told him to get off her, but the defendant refused and, instead, licked her left nipple.[6] C told him to stop and attempted to push his head away. Eventually, C was able to free herself.

The defendant picked up one of C's shirts, tossed it at her,[7] and told her to walk him to the door. Upon leaving, the defendant told C that he would be back on Monday. After the defendant left, C took a long shower because she felt "disgusting." Two days later, C told her mother and her sister what the defendant had done to her. She thereafter went to Yale-New Haven Hospital, where she complained that her arm was hurting her. On July 25, 2005, C gave a statement to police recounting

[5] The record is unclear as to whether C was wearing the bottom of her bathing suit or panties. C did testify, however, that she was not wearing a top or a bra. We hereinafter refer to what she was wearing as her underwear.

[6] C also testified that the defendant had removed her underwear and had attempted to penetrate her in a variety of ways. The defendant, however, was acquitted of the sexual assault charges relating to these allegations. See footnote 2 of this opinion.

[7] The defendant presumably gave C a shirt so that she could cover up her bare chest.

these events. Additional facts will be set forth as necessary.

The defendant first alleges numerous instances of prosecutorial impropriety in the prosecutor's closing and rebuttal arguments that, he claims, deprived him of a fair trial. The defendant's claims can be categorized into three groups. He claims that the prosecutor, in addressing the jury, (1) expressed personal opinion, (2) appealed to the emotions and passions of the jurors, and (3) commented on or suggested that the jurors draw inferences from facts not in evidence. The state asserts that the prosecutor's comments were not improper, and, even if they were improper, they nevertheless did not prejudice the defendant so as to undermine the fairness of his trial. We conclude that, with one exception, the prosecutor's comments were not improper. We further conclude that the one improper comment was minor and isolated and, therefore, did not prejudice the defendant so as to deprive him of a fair trial under the multifactor analysis set forth in *State v. Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987).

We begin by setting forth the applicable law regarding prosecutorial impropriety claims. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. E.g., *State v. Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004). The two steps are separate and distinct. Id. We first examine whether prosecutorial impropriety occurred. Id. Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. Id. In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate

and distinct inquiry. See id."[8] *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

Prosecutorial impropriety can occur during both the cross-examination of witnesses and in the course of closing or rebuttal argument. See *State* v. *Williams*, supra, 204 Conn. 538–39. In the event that such impropriety does occur, it warrants the remedy of a new trial only when the defendant can show that the impropriety was so egregious that it served to deny him his constitutional right to a fair trial. See id., 538–40. "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted.) *State* v. *Alexander*, 254 Conn. 290, 303, 755 A.2d 868 (2000). In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and "[t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003). With these principles in mind, we turn to an examination of the allegedly improper statements.

I

EXPRESSION OF PERSONAL OPINION AND
COMMENTS ON FACTS NOT IN EVIDENCE

A

Closing Argument

The defendant first claims that, during closing argument, the prosecutor improperly expressed his personal

---

[8] We note that, although defense counsel did not object to each instance of impropriety raised in this appeal, it is well established that we need not

opinion regarding C's credibility and the veracity of her accusations. "We consistently have held that it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses." *State* v. *Fauci,* supra, 282 Conn. 35. "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 462.

The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt. "It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he

resort to a review of those claims under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See, e.g., *State* v. *Stevenson,* supra, 269 Conn. 573–75.

is simply saying I submit to you that this is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) Id., 465–66.

We begin with the statements that the prosecutor made in closing argument, which, according to the defendant, represent an improper expression of personal opinion on C's credibility. The first three comments that the defendant highlights clearly were intended to rebut defense counsel's suggestion, made during cross-examination of C,[9] that C's testimony was

---

[9] Defense counsel questioned C about various alleged inconsistencies between her direct examination testimony and her earlier statements to police. For instance, on cross-examination, the following exchange occurred:

"[Defense Counsel]: Okay. Now, do you remember telling the jury here today that [the defendant] came by your house around, what did you say, 3:30 [p.m.]?

"[C]: Yes.

"[Defense Counsel]: That's what you testified to today?

"[C]: Yes.

"[Defense Counsel]: All right. But do you recall, on July 25, 2005, telling the police that [the defendant] came to your house around 5 or 6 [p.m.]?

"[C]: No.

"[Defense Counsel]: You don't recall that?

"[C]: I don't remember.

"[Defense Counsel]: All right. So, if I were to show you a copy of your statement, would that help refresh your recollection as to whether you said that to the police on July 25, 2005?

"[C]: Yes.

* * *

"[Defense Counsel]: Do you recall telling the police on July [25] when you gave your [tape-recorded] statement that [the defendant] came by your house at 5 or 6?

"[C]: Yes.

"[Defense Counsel]: And that's different [from] what you told the jury today?

"[C]: Yes."

Subsequently, during the same cross-examination, the following exchange occurred:

"[Defense Counsel]: Okay. So now you said [the defendant] enters your bedroom, and you say you were awakened by him kissing you on your neck and cheeks. Is that correct?

"[C]: I don't remember that.

"[Defense Counsel]: Do you remember the statement that you gave to the detectives on July 25, 2005?

not credible because she did not recall various details that she had provided in previous statements to the police. First, the prosecutor appealed to the jurors' common sense regarding a young person's ability to remember certain details of a traumatic event after a considerable lapse of time. The prosecutor specifically remarked: "Remember, we're talking about teenagers, asking them to recall events, specific details, something that happened more than a year and a half ago. You have July 15, 2005. *What would you expect, to hear every specific detail, or some things that have lapsed*

"[C]: Yes.

"[Defense Counsel]: Okay. And would it help refresh your recollection to take a look at that statement to see if, in fact, you did say he woke you up by kissing you on the neck and cheeks?

"[C]: I did, and I didn't say I remember it.

"[Defense Counsel]: You did what? I'm sorry.

"[C]: I read it, and I don't remember saying it.

\* \* \*

"[Defense Counsel]: Okay. So you read what you said ten days after the incident but, today, about, I don't know, what is it, a year and a half later, you don't remember?

"[C]: No."

Another example of the use of this tactic occurred later in the cross-examination:

"[Defense Counsel]: What did you do with your free hands?

"[C]: I tried to push him, but he was too big.

"[Defense Counsel]: And you also indicated that you attempted to bite him?

"[C]: Yes.

"[Defense Counsel]: And you never said that to the police in the July 25 statement, did you?

"[C]: I don't remember.

"[Defense Counsel]: Would you like to read your statement to refresh your recollection?

"[C]: No.

"[Defense Counsel]: It's not in there, is it?

"[C]: I don't think so."

These are just three examples in which defense counsel implied that inconsistencies between C's statements to police and her testimony at trial were evidence that she was not being truthful and that the alleged incident never occurred. This also was a central theme of defense counsel's closing argument.

*out of your memory*?"[10] (Emphasis added.) The prosecutor then asked the jurors to draw an analogy from their common experience of a trip to the dentist, suggesting that there would be certain details that one would remember with considerable clarity and other, less relevant details that one might fail to recall or, perhaps, make an educated guess about. He continued: "You are not thinking about those things. You are thinking there is a reason for something happening. Put yourself somewhere else. You are not going to recall those minor details. *I suggest . . . that's what happened with* [C]. She was able to describe for you as she sat in that [witness] chair the things that [the defendant] did. *She got confused, maybe about the order.* How many times was she asked to do that? There is that constant, the constant she told you about, [the details of the alleged sexual assault]. No variations from that, none." (Emphasis added.)

We are not persuaded that any of the foregoing remarks is an improper expression of the prosecutor's opinion of C's credibility. To the contrary, the prosecutor's remarks clearly were intended to appeal to the jurors' common sense and to elicit a particular conclusion about the veracity of C's testimony by inviting the jurors to draw reasonable inferences from the evidence presented to them. It is well established that a prosecutor may argue about the credibility of witnesses, as long

---

[10] In his brief to this court, the defendant generally fails to provide the context for the remarks that he challenges. Rather, he strings together selected portions of the transcript into block quotes, which often are out of chronological order and occasionally start or are cut off mid-sentence without ellipses, or are otherwise unfaithfully reproduced. We note our strong disapproval of this technique and stress the importance of the parties' presentation of an accurate representation of the record to this court. We, therefore, have provided the appropriate context for the remarks that the defendant challenges, and have highlighted the actual statements at issue with italics throughout this opinion, including the particular passage to which this footnote appends.

as his assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom. E.g., *State* v. *Fauci,* supra, 282 Conn. 36. Moreover, "[i]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Stevenson,* supra, 269 Conn. 588–89 n.17.

The prosecutor's comments clearly were referring to the fact that C's testimony varied in several ways from her initial report to police investigators. Indeed, defense counsel highlighted these discrepancies in an attempt to discredit C's version of the events. The prosecutor merely was appealing to the jurors' common sense in offering an alternative explanation for the variations between C's recollection of the alleged assault on July 25, 2005, ten days after it allegedly occurred, and her recollection at trial in January, 2007, nearly one and one-half years later. The prosecutor's remarks suggested that the jurors should rely on their common sense and infer from these inconsistencies not that C had contrived the allegations but, rather, that it is normal for anyone experiencing a traumatic event such as a sexual assault to forget or to be unsure about certain, less important details. The prosecutor's argument clearly does not amount to unsworn testimony, nor does it suggest that he was relying on evidence not in the record. We conclude that this is proper argument on the basis of the evidence presented at trial and reasonable inferences that may be drawn therefrom.

The defendant also challenges that portion of the prosecutor's closing argument in which he refers to the lack of forensic evidence on C's underwear: "The

stipulation about [the] panties, she never put the panties back on. There is not going to be anything there. She went and took a shower. [She] didn't say she put the panties—didn't put panties on. The lab said nothing is there. *Is she lying?*" (Emphasis added.) The prosecutor clearly was not offering his opinion about C's credibility but, rather, was responding to the lack of a particular type of physical evidence and asking the jurors not to draw an inference that C was lying merely because such evidence did not exist.[11] In other words, the prosecutor was arguing that a lack of forensic evidence on C's underwear actually *was consistent* with her testimony that she did not put underwear on after the alleged assault occurred. We find no impropriety in this argument.

The final comment from closing argument that the defendant challenges as an improper expression of personal opinion was the suggestion that C's ability to perform a live demonstration of the alleged sexual assault at trial supported her credibility. The prosecutor argued in relevant part: "[C] was . . . telling you about what happened. Ultimately, she got up and was able to demonstrate. *Quite the feat, perhaps, for somebody of her age. An elaborate scheme; something she created out of her head to come forward with; something to maintain for eighteen months, to make this all up so that she could come into the courtroom and make a*

---

[11] The prosecutor's use of the rhetorical query, "[i]s she lying," does not transform this argument into an improper expression of his personal opinion of C's credibility. As we repeatedly have declared: "The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 465–66. The rhetorical question in the present case was used merely to underscore that the lack of forensic evidence on C's underwear does not require or even suggest that her complaint was contrived in light of her testimony that she did not put her underwear back on after the alleged assault occurred.

*demonstration*? She had no idea that was going to happen, but she was able to describe by standing, by moving [a person acting as the defendant] around in the positions she just described for you, [in] the same manner, in an effort to help clear up, so you could see what she was talking about, what she was remembering." (Emphasis added.) It was not improper for the prosecutor to suggest that C was credible by virtue of her willingness and ability to perform a detailed demonstration of how the alleged sexual assault unfolded. "This court previously has concluded that the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence." *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006). In the present case, the prosecutor merely was urging the jurors to consider the commonsense notion that a witness who is physically able to demonstrate, in a detailed manner, conduct consistent with what he or she has testified to, might be considered more reliable than a witness who merely testifies about such conduct. We conclude that this is an inference that the jurors reasonably could have drawn from the evidence, and the prosecutor's comment was not an improper expression of his personal opinion.

B

Rebuttal Argument

The defendant also challenges a number of statements that the prosecutor made in his rebuttal argument, all of which either question C's motive to lie or address defense counsel's assertion that C's accusations were a recent fabrication.[12] We will address each

---

[12] We note that the defendant's claims regarding the prosecutor's alleged expression of personal opinion as to the credibility of witnesses ring somewhat hollow in light of defense counsel's initial argument in closing: "I have a script. I have some things that I want to say, but I was listening to [the prosecutor]. I just want to point out a few things. I find it very telling that he stands here and . . . says, 'if you believe, if you believe,' instead of saying 'you should believe.'" Not only does this strike us as an invitation

of these categories in turn. With respect to the statements about C's lack of a motive to lie, this court clearly has established the propriety of a prosecutor's comments on such motives, as long as the remarks are based on the "ascertainable motives of the witnesses rather than the prosecutor's personal opinion." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 37; see also *State* v. *Warholic*, supra, 278 Conn. 365 ("the state may argue that a witness has no motive to lie"); *State* v. *Bermudez*, 274 Conn. 581, 593, 876 A.2d 1162 (2005) (prosecutor properly argued that witness "had nothing to gain by testifying falsely"); *State* v. *Ancona*, 270 Conn. 568, 607, 854 A.2d 718 (2004) ("[i]t is permissible for a prosecutor to explain that a witness either has or does not have a motive to lie"), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *Burton*, 258 Conn. 153, 170, 778 A.2d 955 (2001) ("the state may properly argue that the witnesses had no apparent motive to lie").[13]

---

for the prosecutor to state his personal opinion on what the jury "should believe," but it also would seem to be an admission by defense counsel that the prosecutor did not, in fact, express an opinion as to the credibility of the witnesses in his closing remarks. This comment was not lost on the prosecutor, who responded in his rebuttal argument: "There are rules in the system. The system requires that the state and the attorneys cannot technically comment with respect to what you should believe, in terms of credibility. That job is for the ladies and gentlemen of the jury. That is your job. And your job is to decide who do you believe, who do you not believe. And it has to be based on common sense. It has to be based on your life experiences, inferences, logical inferences to be drawn from the information you've heard."

[13] The defendant's reliance on *State* v. *Alexander*, supra, 254 Conn. 290, for the proposition that the prosecutor's comments during his rebuttal argument were improper is misplaced. The comments in the present case are distinguishable from those in *Alexander* in the same way that the comments in *Warholic* are distinguishable from those in *Alexander*. In *Alexander*, the prosecutor made the following statement: "I don't know of that many eight or nine year olds [who] are that sophisticated to fabricate a story involving sexual abuse." (Internal quotation marks omitted.) Id., 301. We determined that the prosecutor, in claiming generally that no child would make up a story regarding sexual abuse, improperly vouched for the child victim's credibility. Id., 305. "In *Alexander*, there was no evidentiary support for the

Thus, the remaining issue is whether the prosecutor's remarks regarding C's lack of a motive to lie were based on the evidence presented to the jury and inferences that reasonably could be drawn from that evidence. In his first comment, the prosecutor simply noted that there was no evidence suggesting a motive for C to falsely accuse the defendant of assaulting her: "What possible motive would [C] have to accuse [the defendant]? There is no indication anywhere when she was asked; no arguments, no animosity. *There is no reason for her to come in and make up these lies.*" (Emphasis added.) This argument clearly was based on the fact that the evidence did not suggest that C was harboring any ill will toward the defendant such that she would be motivated to pursue the grave course of falsely accusing the defendant of sexually assaulting her. Thus, this remark clearly was proper.

The next two challenged remarks refer to the nature of C's allegations. The prosecutor stated: "*You still haven't heard the motive. If you are going to make something up, why not just say he went all the way to sexual intercourse? He made me perform oral sex on him. He made me do this, he made me do that, he made me do this. It wasn't there.* She explained the three different types of violations that were done to her by [the defendant]. And she stayed with that and gave you the details of that. *If you are going to lie, why not just keep on lying and lying and lying?* We didn't hear that."[14] (Emphasis added.) In our view, this

prosecutor's argument that the allegation of abuse would have been difficult to fabricate; thus, the sole source for this assertion was the opinion of the prosecutor." *State* v. *Warholic*, supra, 278 Conn. 367. We conclude that, in the present case, as in *Warholic*; see id.; the prosecutor's assertions regarding C's lack of motive to lie were based on evidence adduced at trial rather than on facts not in evidence or personal opinion.

[14] The prosecutor returned to the issue of motive at the end of his rebuttal argument: "If she is going to fabricate [the story], ladies and gentlemen, why not go all the way? Use common sense, listen to the judge's instruction[s], go in and deliberate, and ask yourselves these questions: What motive? What reason [could C] possibly [have] to accuse that man of sexually assaulting

argument is a permissible appeal to the common sense of the jurors on the basis of the very limited and specific nature of C's accusations. It would be reasonable for the jurors to infer that, if C had a motive to lie due to her desire to harm the defendant, her accusations would be less specific and would involve more severe conduct. Of course, this is not the *only* reasonable inference that could be drawn from the nature of the allegations, but it *is* based on the evidence, and it would be reasonable for the jurors to draw such an inference. Thus, the remarks were not improper.

In his closing argument, defense counsel noted: "[C] did say [that the defendant] threatened her . . . but that's a recent fabrication, in my opinion, just like this whole event." The prosecutor subsequently attempted to rebut defense counsel's explicit statement of his opinion regarding the veracity of C's accusations. In his rebuttal, the prosecutor asked the jurors, "in your own mind[s], *do you think [that C is] clever enough to fabricate, to come up with details to fool everybody throughout the system? . . . Is she going to put herself through [an embarrassing physical examination]*?[15] *For what?*" (Emphasis added.) At the close of his rebuttal argument, the prosecutor returned to this theme: "*To subject herself to the physical exam[ination], the discussions with her mother, the discussions with the family, surely, other people that she does not know, to put herself through that, for what benefit? I haven't heard of that. You have to ask yoursel[ves], is that because what she was telling was true?*"[16] (Emphasis

her? At this point, there is none." For the reasons set forth in the text of this opinion, we conclude that these comments also were not improper.

[15] The prosecutor was referring to the medical examination that C underwent in order to aid the investigation of her allegations of sexual assault.

[16] In a similar vein, the prosecutor also remarked: "In your own life experience[s], listen to the testimony that the doctor gave you and what the nurse gave to you, and make your own determination of the type of abuse and whether or not you think that each of the people that got up here and testified as to what happened—if it's that big of a thing where it could have

added.) We conclude that these statements are not improper.

To the extent that these remarks implicate the lack of a motive for C to lie, they are appropriate under *Warholic* and its progeny because they are based on the facts in evidence and not on personal opinion. In addition, the comments in which the prosecutor asked the jurors to use their common sense to infer that C's complaint was more credible because it required her to undergo an uncomfortable medical examination and embarrassing conversations with both her family members and complete strangers, also were proper. We considered similar remarks in *Warholic*, in which the prosecutor "urged the jury to consider, in its assessment of [the victim's] credibility, why he would put himself in a position to have to explain to his father that he had performed oral sex on an adult male." *State* v. *Warholic*, supra, 278 Conn. 365–66. We held that "[t]his statement properly called on the [jurors] to use [their] common sense and experience to determine that [the victim's] testimony was truthful." Id., 366. The prosecutor in *Warholic* "similarly argued that the jury, in its determination of [the victim's] credibility, should consider [the victim's] testimony that he was ashamed of these acts and that he felt that performing these acts meant [that] he was homosexual. This was also proper

been something as recent fabrication or made up, would it be able to be something that would be able to be carried along to the degree that we could do a demonstration . . . where [C] is standing before you . . . . She already placed herself in a position to remember; she put herself there in her room where she is standing on this side of the bed and indicated the window's here. She's laying that out for you. Is this something that people are going to think of to fool everybody or something that she is thinking and remembering? He rolled me, picked me up. Look at the size of him, he's a big man. She could have said that, but she didn't. She was consistent with how she described his turning her." The prosecutor, again, was responding to the suggestion of recent fabrication and asking the jurors to draw an inference of credibility on the basis of the limited and specific nature of C's testimony. We find no impropriety in this argument.

argument because it asked the jury to make reasonable inferences from the evidence that would bolster [the victim's] credibility." Id. We find the prosecutor's statements in the present case materially indistinguishable from those that we found permissible in *Warholic* and thus conclude, for the reasons expressed in that case, that the statements in the present case also are proper.

In his rebuttal argument, the prosecutor also addressed defense counsel's suggestion that C's trial testimony was inconsistent with the statement that she had given to the police several days after the incident. The prosecutor argued that C's trial testimony did not actually *contradict* her statement to the police but, rather, revealed that she could not remember some of the details that she had relayed at the time.[17] These comments are based on C's July 25, 2005 statement to the police, as well as on her trial testimony under questioning by both the prosecutor and defense counsel. There is no indication that the prosecutor was offering his personal opinion regarding the truthfulness of this evidence; rather, the prosecutor's remark suggests that he was attempting to show, factually, that the evidence was not contradictory as defense counsel had suggested it was during his closing argument. We conclude that there was no impropriety.

In his rebuttal argument, the prosecutor made one remark that we consider improper. He stated: "The doctors, to do an examination, *do you think a doctor is going to put a fourteen year old through the type of*

---

[17] The prosecutor argued: "Use your common sense, ladies and gentlemen, and draw the inferences from the evidence. Draw the inferences from your life experience[s] as to what is believable, as far as some of the answers [C] gave wasn't necessarily—it wasn't wrong. She was confronted by [defense counsel] on a number of occasions with the statements, the statements [that] she gave to the police: 'Did you say that?' 'I can't remember.' 'I cannot remember.' 'It wasn't.' 'I didn't say it.' 'I can't remember if I said it.' It's in the statement. It's there. It wasn't made up. She couldn't remember it."

*examination where they strip her down, take a look at her genitalia? Do you think they are going to do that to somebody who is lying?"* (Emphasis added.) The basic rule regarding prosecutorial statements that are unsupported by the evidence adduced at trial is clear. "Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." *State* v. *Alexander,* supra, 254 Conn. 306. In our view, the prosecutor's assertion that the examining physician would not have conducted the examination if C was lying is analogous to statements that we concluded were improper in *Alexander.* See id. In *Alexander,* "the prosecutor did not confine herself to the record. She explained to the jury, '[t]hat's how little kids think,' without any evidence to support this assertion. She stated that children 'can't make this up . . . .' The summation suggested that [an] eight year old is not 'sophisticated' enough to conjure up a story of sexual abuse, without any evidence supporting that contention." Id.

A thorough review of the trial transcripts in the present case reveals that the prosecutor's assertion is without evidentiary support. We can find no testimony that would support the inference that the physician responsible for examining C after the alleged sexual assault made a preliminary determination regarding the credibility of her complaint prior to examining her. Furthermore, this statement could not be justified as a mere appeal to common sense because it is not necessarily common sense, in our view, that a physician's decision to conduct an examination under these circumstances would be contingent on his own personal view of the veracity of the patient's complaint. See W. Rogers, "Is There a Moral Duty for Doctors To Trust Patients?," 28 J. Med. Ethics 77, 78 (2002) ("[t]rust in the honesty of the patient is not usually questioned").

Our conclusion that this statement was improper does not, of course, put an end to the inquiry. We still must determine whether this impropriety was egregious enough that it deprived the defendant of his constitutional right to a fair trial. See, e.g., *State* v. *Williams*, supra, 204 Conn. 539. "In determining whether [the] prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) Id., 540.

Applying these factors to the statement at issue, we conclude that the statement was not sufficiently egregious that it denied the defendant due process of law. First, the remark was part of a series of comments directly responding to defense counsel's repeated attacks on C's credibility during his closing argument, in which he repeatedly described C's testimony as "improbable," "inconsistent"[18] and "impossible . . . ." Defense counsel also expressed his personal opinion during closing argument that C's allegations were a "recent fabrication" and criticized the prosecutor for not expressing *his* personal opinion on the credibility of the witnesses. Thus, to some extent, the prosecutor's improper remark had been invited by defense counsel's arguments.

Moreover, and more importantly, the comment was neither severe nor frequent; rather, it was minor and

[18] Although defense counsel did not actually use the word "inconsistent," he frequently referred to the "inconsistencies" in C's testimony and her pretrial statements to the police.

isolated. Indeed, when the comment is viewed in context, it is clear that the prosecutor's focus was to persuade the jurors that C would not have put herself through the ordeal of a medical examination if her complaint was nothing but a charade.[19] The comment, though improper, was diluted by the context in which it was made and appears relatively trivial in the scope of the prosecutor's rebuttal argument as a whole. This conclusion is bolstered by the fact that, although defense counsel did specifically object to this comment,[20] he did not suggest or request a curative instruction to remedy the perceived impropriety. "The failure . . . to request specific curative instructions frequently indicates on appellate review that the challenged [impropriety] did not deprive the defendant of a fair trial." *State* v. *Stevenson*, supra, 269 Conn. 597–98. Moreover, the trial court reminded the jurors repeatedly that they were the "sole judges of the facts" and that they "must not resort to guesswork, conjecture or suspicion, nor be influenced by any personal likes or dislikes, opinions, prejudices or sympathy." This general admonishment is significant when weighed against the relative insignificance of the improper comment. See, e.g., *State* v. *Stevenson*, supra, 598.

Finally, although the state's case rested almost entirely on the credibility of C, the complaining witness,

---

[19] Immediately following the improper comment, the prosecutor asked: "Is [C] going to put herself through that? A fourteen year old is going to put herself through that? For what? There is no reason. We have not heard a reason for her to lie." Subsequently, in his rebuttal argument, the prosecutor returned to this theme: "To subject herself to the physical exam[ination] . . . to put herself through that, for what benefit? I haven't heard of that."

[20] The state declares in its brief to this court that "defense counsel objected only to the prosecutor's argument that [C] had no motive to lie and not to any of the other remarks [that the defendant] challenges on appeal." We disagree. At the conclusion of the prosecutor's rebuttal argument, defense counsel made the following objection: "What I wrote down, why would a doctor examine [C] if she was lying? Wouldn't an experienced attorney catch her in a lie? The first one, with respect to the lie, almost bolsters the credibility of [C] by saying a doctor would catch her . . . ."

it is significant that the jury found the defendant not guilty of the more serious charges of sexual assault, finding him guilty only of risk of injury to a child. In *State* v. *Thompson*, supra, 266 Conn. 482, we considered the fact that the jury had found the defendant in that case not guilty of murder but guilty of the lesser included offense of reckless manslaughter as relevant to an assessment of the effect that any prosecutorial improprieties may have had on the jury. In *Thompson*, we concluded that that fact was "an indication that the jury [had] made its finding rationally, [on the basis of] the evidence, and [had] not [been] unduly swayed by the instances of prosecutorial [impropriety]." Id. Similarly, in the present case, we believe that the jury's verdict of not guilty on the more serious charges is a strong indication that the defendant was not prejudiced by the prosecutor's improper statement.

We ultimately conclude that the impropriety did not "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539, quoting *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Thus, the defendant has failed to meet his burden of establishing substantial prejudice as a result of the prosecutor's improper comment. See, e.g., *State* v. *Alexander*, supra, 254 Conn. 303. We proceed, therefore, to consider the defendant's other claims of impropriety.

## II

### GOLDEN RULE ARGUMENTS

The defendant also claims that several of the prosecutor's remarks violate the prohibition against so-called "golden rule" arguments. This court has had recent occasion to define golden rule arguments and explain the reasoning behind their prohibition. We have declared that "[a] golden rule argument is one that urges

jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 771, 931 A.2d 198 (2007), quoting *Murray* v. *Taylor*, 65 Conn. App. 300, 321, 782 A.2d 702, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001). *Bell* apparently was the first opportunity for this court to consider the propriety of golden rule arguments, particularly in the context of a criminal case. After reviewing the jurisprudence of our sister states, we noted that "[t]he golden rule claims in criminal cases that our research has uncovered arose when the prosecutor asked the [jurors] to put [themselves] in the place of the victim, the victim's family, or a potential victim of the defendant." *State* v. *Bell*, supra, 772. We then proceeded to explain: "The danger of these types of arguments lies in their [tendency] to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability." (Internal quotation marks omitted.) Id., 773. We further equated golden rule arguments with the more general proscription on prosecutorial appeals to the jurors' emotions. See id. This court has recognized on numerous occasions that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) Id.

During closing argument, the prosecutor made the following remarks, which the defendant challenges as improper golden rule arguments: "Now, when you apply a situation similar to [a teenager's tendency to respond, 'nothing,' when asked what he or she did all day], *think of what it would be like as [C] is sitting, having to explain to somebody what happened to her, her whole life experiences. Would you be able to sit down with a group of people you don't know, talk about the last sexual experience you had in detail, or would that be uncomfortable, something you don't like to talk about,* something that you prefer to keep private? Use your common sense, as you apply it, listen to it, the testimony that she gave for however long she was on the stand, better part of a full day, weigh the answers that she gave you, weigh the number of times that she had to go through and tell, first of all, she told [her sister], then told her mom, then told a police officer, then told who knows how many people, Yale-New Haven Hospital, what that man did to her. *Don't do that from an adult perspective. Do it from the perspective that [C] would have had, a teenager, a young teen, just barely turned fourteen.*

\* \* \*

"After she takes that shower, she goes back, she waits, doesn't know what to do, doesn't know how anybody is going to react. She tells [her sister]. She gets rejected, goes back to her room, and her mom hears her crying. Common sense, ladies and gentlemen, natural reaction, perhaps. Then mom comes and questions what happened. What happened? So, she blurts out to her mother what happened: 'He raped me.' Mom's reaction: What? Who? . . . She's now questioning [C's] report to her. [C's] thoughts at that point, common sense, ladies and gentlemen, life experience. You are allowed to use that when you are thinking of these details, not what door they came in after they came in

from camp; does that matter? Stay focused on what the true issue is. When you stay focused on what the true issue is, *look at it from the perspective of that fourteen year old girl, that young girl, as to what happened.*"[21] (Emphasis added.)

The defendant also refers to two statements that the prosecutor made during his rebuttal argument that, according to the defendant, are improper golden rule arguments. First, the prosecutor, in responding to defense counsel's suggestion that C had fabricated her allegations, in part because she had not suffered any injury as a result of the alleged sexual assault, appealed to the jurors' life experiences: *"After you have sex, do you run to the emergency room? Are you battered, bruised and bleeding . . .* ? Is there likely to be an injury? Common sense, ladies and gentlemen. Would there likely be some type of injury from something, the type of contact that was alleged?" (Emphasis added.) Toward the end of his rebuttal argument, the prosecutor responded to defense counsel's implication that C's failure to engage in a struggle with the defendant when he allegedly was assaulting her undermined the credibility of her story: *"Again, view this from [C's] point of view, a young teenager, a man that size confronting her, nobody around, sister perhaps is upstairs.* She tried to push him. She explained [that] he had a hold of her arm and was holding her. She tried to move but couldn't move. . . . She has a man of that size holding down on her . . . . Is there room for a rational thought there?" (Emphasis added.) The defendant asserts that all of these statements are improper because they

_____

[21] The defendant also claims, with respect to several of these italicized portions of the prosecutor's argument, that the prosecutor improperly appealed to the jurors' emotions. To the extent that the prohibition on golden rule arguments is merely a subset of this type of prosecutorial impropriety, we need not separately analyze these statements under the prohibition against golden rule arguments *and* the prohibition against appealing to jurors' emotions.

appeal to the jurors' emotions by encouraging the jurors to empathize with C rather than to evaluate the evidence objectively. We disagree.

In *Bell*, the prosecutor had, on several occasions, urged the jurors in that case to put themselves in the place of the defendant and another witness when they considered the credibility of the witness' testimony. *State* v. *Bell*, supra, 283 Conn. 769–70. We held that these did not amount to improper golden rule arguments because "the prosecutor was not appealing to the jurors' emotions or to their sympathies for the victim. Rather, he was asking the jurors to draw inferences from the evidence that had been presented at trial regarding the actions of the defendant and [the witness], based on the jurors' judgment of how a reasonable person would act under the specified circumstances. Thus, when the [prosecutor] asked the jurors to put themselves in the defendant's shoes, if he were innocent, and to evaluate his actions, the [prosecutor] properly was asking them to infer the defendant's consciousness of guilt from his deceptive actions involving his interrogation. Similarly, the [prosecutor] attempted to have the jurors put themselves in [the witness'] place to determine whether her confusion as to the course of events on the evening of the shooting reasonably could be explained by her alarmed state of mind caused by the circumstances in which she found herself and her children." Id., 773–74. Because the prosecutor in *Bell* was not asking the jurors to put themselves in the shoes of the actors in order to elicit sympathy or to distract the jurors' focus from an objective appraisal of the evidence but, rather, was "asking the jurors to draw inferences from the evidence that had been presented at trial"; id., 773; there was no impropriety.

The animating principle behind the prohibition on golden rule arguments is that jurors should be encouraged to decide cases on the basis of the facts as they

find them, and reasonable inferences drawn from those facts, rather than by any incitement to act out of passion or sympathy for or against any party. See, e.g., *State* v. *Williams*, supra, 204 Conn. 545–46. Although we recognize that this danger is most acute when the prosecutor asks the jurors to put themselves in the position of the *victim* rather than the defendant or another witness, as in *Bell*, we conclude that the principle barring the use of such arguments is the same regardless of which individual is the subject of the prosecutor's emotional appeal. On the basis of this principle, we conclude that the prosecutor's comments in this case are similar to those of the prosecutor in *Bell* insofar as they were not intended to unduly arouse the jurors' emotions or to elicit the jurors' sympathies; rather, they were intended to encourage the jurors to draw inferences from the evidence of C's actions that were presented at trial on the basis of the jurors' views as to how a reasonable fourteen year old would act under the circumstances. See *State* v. *Bell*, supra, 283 Conn. 773. The prosecutor's statements served as a response to the insinuation of fabrication that formed the core of the defense strategy and the underlying theme of defense counsel's closing argument. When the prosecutor asked the jurors to place themselves in C's position and to evaluate her actions and statements during and after the alleged sexual assault, the prosecutor properly was arguing that C's conduct was consistent with that of a truthful witness rather than improperly attempting to sway the jury's objectivity through an emotional appeal. Thus, we conclude that the prosecutor's statements did not violate the prohibition on golden rule arguments.

### III

### APPEAL TO THE JURORS' EMOTIONS

Finally, the defendant contends that several of the prosecutor's remarks improperly appealed to the jurors'

emotions, only one of which remains to be addressed.[22] During his closing argument, the prosecutor, in commenting on C's ability to conduct a detailed, in-court demonstration with the assistance of another person, stated, "[C] was . . . telling you about what happened. Ultimately, she got up and was able to demonstrate. *Quite the feat, perhaps, for somebody of her age.* An elaborate scheme; something she created out of her head to come forward with; something to maintain for eighteen months, to make this all up so that she could come into the courtroom and make a demonstration?" (Emphasis added.) As we previously have noted, it is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. See, e.g., *State* v. *Thompson,* supra, 266 Conn. 473–74. "An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record." *State* v. *Alexander,* supra, 254 Conn. 307. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." *State* v. *Williams,* supra, 204 Conn. 546. An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character; see *State* v. *Alexander,* supra, 307; or a plea for sympathy for the victim or her family. See *State* v. *Thompson,* supra, 474; see also *State* v. *Williams,* supra, 547 ("[i]t is improper for the prosecutor to encourage the jury to identify with the victim").

---

[22] As we previously noted; see footnote 21 of this opinion; the defendant challenges several of the prosecutor's statements under both the prohibition against golden rule arguments and the prohibition against appealing to jurors' emotions. We considered those overlapping statements in part II of this opinion and, therefore, will not reconsider them in this part of the opinion.

The prosecutor's remark that it would be "[q]uite the feat, perhaps, for somebody of [C's] age" to concoct such a detailed and specific accusation, and then be able to direct a demonstration of it in court, was not improper. The remark neither disparaged the defendant nor painted C as particularly vulnerable or deserving of sympathy. The comment clearly was designed to refute defense counsel's theory that C recently had fabricated her allegation of sexual assault. The prosecutor was arguing on the basis of the evidence presented at trial and was asking the jury to draw the inference that it was unlikely for C to have concocted her particular story and the inference that it was even more unlikely that she would have been able and willing to demonstrate it convincingly. There was no emotional appeal and, therefore, no impropriety.

In sum, we conclude that only one of the prosecutor's statements was improper and that that statement did not deprive the defendant of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other justices concurred.